## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

REGINALD WILLIAMS                                    CIVIL ACTION

VERSUS

NATIONSTAR MORTGAGE, LLC.                 NO. 19-00663-BAJ-SDJ

### RULING AND ORDER

This is a home mortgage loan dispute. Plaintiff's Amended Petition alleges that Defendant Nationstar Mortgage, LLC violated several provisions of the Equal Credit Opportunity Act (ECOA), 15 U.S.C. § 1691, *et seq.*, when it processed his application for a home mortgage loan. (*See* Doc. 32-4 at pp. 5–6). Plaintiff further alleges that because of Defendant's violations, a monetary judgment of $24,500 was entered against him. (*See* Doc. 32-4 at p. 6).

Now before the Court is Defendant's **Motion for Summary Judgment (Doc. 82),** which argues that Defendant did not violate the ECOA, and that Plaintiff's action must be dismissed with prejudice. (*See* Doc. 82-1 at pp. 1–2). Plaintiff opposes Defendant's Motion. (Doc. 87). For the reasons stated herein, Defendant's Motion will be granted.

### I.    BACKGROUND

#### A. Summary Judgment Evidence

The following facts are drawn from Defendant's Statement of Undisputed Material Facts (Doc. 82-2, "DEF SOF"), Plaintiff's Response to Defendant's Statement of Undisputed Material Facts (Doc. 87-12, "Williams SOF"), and the record evidence

submitted in support of these pleadings.

Prior to the events giving rise to this lawsuit and at all times thereafter, Plaintiff owned and resided at 14257 Stone Gate Drive, Baton Rouge, LA 70816 (the "Stone Gate Property"). (*See* DEF SOF ¶ 8). This property is financed through Defendant. (*See* Doc. 87-1 at p. 1).

On April 3, 2017, Plaintiff spoke on the phone with Nic McKinney, a loan officer employed by Defendant, inquiring about the possibility of a mortgage loan. (*See* Doc. 87-1 at p. 2).[1] Following this phone call, Plaintiff sent initial supporting documents to McKinney.

On April 5, 2017, Defendant issued a pre-qualification letter to Plaintiff informing him that he had been "conditionally pre-qualified for a mortgage loan" in the amount of $270,000, "subject to receipt of the following document requirements and guidelines in accordance with the lender": (1) a complete loan application; (2) supporting documents to verify income, assets, liabilities, and other information disclosed on the loan application; (3) a fully executed Sales Contract; (4) the subject property meeting valuation, condition, and marketability requirements; and (5) no material change in the applicant's creditworthiness and financial condition. (*See* Doc.

---

[1] Plaintiff describes this initial request to Defendant as an "application" in his pleadings. (*See* Doc. 42 ¶ 6; Doc. 87-1 at p. 2). However, under the ECOA, an application is "an oral or written request for an extension of credit that is *made in accordance with procedures used by a creditor for the type of credit requested*." 12 C.F.R. § 1002.2(f) (emphasis added). Defendant's procedures required that applications be submitted in writing using their application form. (*See* DEF SOF ¶ 4). The undisputed evidence shows that Plaintiff did not sign and submit Defendant's application form until April 22, 2017, after he selected a home he wanted to purchase. (*See* DEF SOF ¶ 13). Thus, pursuant to the ECOA, this initial inquiry was *not* an application.

84-2 at p. 1). The April 5 pre-qualification letter also emphasized that "[t]his conditional prequalification does not guarantee loan approval or is it a commitment to make a loan at the rate and terms stated. The conditional prequalification is subject to program guidelines and requirements in place at [the] time of [the] application and are subject to change without notice." *See id.*

In response to the request for documents set forth in Defendant's April 5 prequalification letter, Plaintiff submitted tax returns to verify his income, assets, and liabilities. (*See* Doc. 56-4 at p. 18). He did not, however, submit a complete application, a fully executed Sales Contract, or all the supporting documents identified in the April 5, 2017 letter. (*See* Doc. 56-4 at p. 20).

Fifteen days later, on April 20, 2017, Plaintiff executed a Louisiana Residential Agreement to Buy or Sell (the "Purchase Agreement") offering to purchase a property at 34083 Springlake Drive, Walker, LA 70785 (the "Springlake Property") from Kathryn Wilson for $243,000, with a closing date of May 31, 2017. (*See* DEF SOF ¶ 9). Peggy Font, Plaintiff's real estate agent for the Springlake Property purchase, sent the Purchase Agreement to McKinney.[2]

After Plaintiff signed the April 20 Purchase Agreement, but before he submitted his loan application to Defendant, Plaintiff spoke on the phone with McKinney regarding Plaintiff's request for a loan to purchase the Springlake Property.[3] (*See* DEF SOF ¶ 11). During this recorded phone call, McKinney confirmed

---

[2] The Parties do not provide the date Font sent the Purchase Agreement to McKinney. However, it appears from the undisputed evidence that McKinney received the Agreement between April 20th and April 22nd. (*See* Doc. 56-4 at p. 20).

[3] Throughout the pleadings, Plaintiff attempts to deny or qualify Defendant's version of the

with Plaintiff that Plaintiff would be selling the Stone Gate Property, or, in the event

Plaintiff could not sell it, renting the Stone Gate Property:

> **NIC MCKINNEY:** Now, with you having the current property—you know, and again, you may sell it next week or a couple weeks from now. You know, no big deal. But as long as your house is under contract, you're good to go. It doesn't necessarily mean it has to be sold yet. But as long as it's at least under contract to be sold, you're good to go. And when I say good to go, meaning we will look at the occupancy. You know, the underwriters will say, well, he has a primary already. You know, we will be able to say, hey, this house is going to be sold on this date. You know, and you're good to go. No issues at all.
>
> Now, let's just say it does not have a contract. Still—you could still go primary with this new property, but you would have to agree to at least rent that one out. You know, you have to—you have to turn that one into an investment property or it has to be under contract in order for us to honor your new purchase as a primary residence, because legally you can only have one primary residence.
>
> And like I said, I always like to kind of get this out in front of you so that way you know, you know, kind of what to expect moving forward.
>
> **PLAINTIFF:** Yes, sir. Yes, sir.
>
> (Doc. 84-10 at pp. 248–49).

At his deposition, Plaintiff confirmed that based on this phone call with

McKinney, he understood that the Stone Gate Property either needed to be under

contract to be sold, or converted to a rental property and rented out, in order for him

to receive the loan he was requesting for the purchase of the Springlake Property:

---

facts but fails to provide evidence to support his version. Indeed, Plaintiff repeatedly cites evidence that does not address, let alone deny or controvert, the Defendant's statements of fact. Under Local Rule 56(f), "facts contained in a supporting or opposing statement of material facts, if supported by record citations are required by this rule, shall be deemed as admitted unless properly controverted." Accordingly, although Plaintiff objected to certain statements of facts by Defendant, the Court nonetheless deems them as admitted because of Plaintiff's failure to properly controvert.

**DEFENSE COUNSEL:** (After playing the recording of the conversation between Plaintiff and McKinney). Does this refresh your recollection as to whether or not you had ever been told previously that current home needed to be under contract to be sold in order to go forward with the new loan on the new property?

**PLAINTIFF:** No.

**DEFENSE COUNSEL:** Okay. What part of that is unclear from that conversation?

**PLAINTIFF:** He said I can't own two homes. One have to be either rented out—

**DEFENSE COUNSEL:** Okay.

**PLAINTIFF:** I can't have two homes that are primary.

**DEFENSE COUNSEL:** Okay. So it either needed to be under contract to be sold or converted to a rental property where it would be rented out. Right?

**PLAINTIFF:** Yes.

**DEFENSE COUNSEL:** So did you ever convert it to a rental property to be rented out, the Stone Gate Propety?

**PLAINTIFF:** No. I did not.

**DEFENSE COUNSEL:** Okay. So, the two options were in order to close, you either got to be under contract to sell the Stone Gate Property, or you have to have converted it to a rental property in order to go forward. That is what Mr. McKinney just told you. Correct?

**PLAINTIFF:** He said that and more.

**DEFENSE COUNSEL:** Okay. So...and this is before you filled out the application that we just looked at on April 22nd. Right?

**PLAINTIFF:** No. That is during the time I was inquiring on Miss Wilson's home.

**DEFENSE COUNSEL:** Okay. So before April 22nd?

**PLAINTIFF:** 22nd. Maybe. Yes.

**DEFENSE COUNSEL:** Okay. So this is Mr. McKinney saying, your house either needs to be—Stone Gate, it needs to be under contract to be sold, or needs to be converted to a rental property and rented out, in order to go forward with this loan you are discussing here. Right?

**PLAINTIFF:** Yes. Because I could not occupy two primary residences.

(Doc. 84-10 at pp. 250–51).

On April 22, 2017, Defendant sent to Plaintiff a Uniform Residential Loan Application (the "Loan Application") that included information regarding Plaintiff's loan request, his assets, and his liabilities for Plaintiff to review, complete, and sign. (*See* DEF SOF ¶ 13). Defendant also sent a Loan Estimate that projected that the total monthly payment for the Springlake Property mortgage would be $1,673. *See id.* Later that day, Plaintiff returned the completed Loan Application, electronically signed and initialed at the bottom of each page. (*See* DEF SOF ¶ 14).

Plaintiff's April 22 Loan Application listed the Stone Gate Property as Plaintiff's current primary residence and noted that the home is encumbered by a mortgage loan from Defendant with an unpaid balance of $170,896. (*See* DEF SOF ¶ 17). In the "Schedule of Real Estate Owned" section of the Loan Application, however, Plaintiff listed the Stone Gate Property as "Sold," despite not having even listed the Stone Gate Property for sale at this time. (*See* DEF SOF ¶¶ 21, 35).

On April 26 and 27, 2017, Plaintiff and Wilson executed an addendum to the Springlake Property Purchase Agreement, reducing the Springlake Property's sale price to $240,500. (*See* DEF SOF ¶ 31).

On April 28, 2017, Defendant submitted the Loan Application to its

underwriting department for review. (*See* DEF SOF ¶ 32). On May 2, 2017, Defendant's underwriters conditionally approved the Loan Application and internally issued an Underwriting Conditional Approval (the "Conditional Loan Approval"). (*See* DEF SOF ¶ 33). The Conditional Loan Approval included a list of outstanding documents and information that Defendant still required from Plaintiff, including documentation showing that the Stone Gate Property was sold, and that the existing mortgage loan for the Stone Gate Property was paid off. *See id.*

Defendant did not send the Conditional Loan Approval to Plaintiff. Rather, Defendant's internal records indicate that on May 4 and May 12, 2017, Defendant attempted to contact Plaintiff by phone to inform him of the documents and information that remained outstanding. (*See* Doc. 84-8 at p. 6). However, the Defendant could not be reached. *See id.* Nonetheless, according to Defendant's records, on May 15, 2017, Sheena Hodge-Njoroge, a loan processor employed by Defendant, successfully contacted Plaintiff and reviewed the outstanding items listed on the Conditional Loan Approval. (*See* DEF SOF ¶ 34). At his deposition, Plaintiff did not remember the May 15 phone call:

> **DEFENSE COUNSEL:** (After showing Plaintiff Defendant's internal records). Did you have a call with Sheena on May 15th, 2017?
>
> **PLAINTIFF:** I'm not aware of the date when I talked to Miss Sheena.
>
> **DEFENSE COUNSEL:** Did you have a call with Sheena sometime around May 15, 2017?
>
> **PLAINTIFF:** I can't say I did or not.
>
> **DEFENSE COUNSEL:** Okay. Do you have—

**PLAINTIFF:** I don't remember.

**DEFENSE COUNSEL:** Do you have a recording of that call?

**PLAINTIFF:** I have to check.

**DEFENSE COUNSEL:** Okay. So I know it is a long time ago. It is 2017. When you say you don't remember having a call, does that mean a call didn't occur, or you just don't remember it?

**PLAINTIFF:** I just don't remember it.

(Doc. 56-4 at p. 60).

Two days later, on May 17, 2017, Plaintiff hired a real estate agent to sell the Stone Gate Property, and thereafter listed the property for sale. (*See* DEF SOF ¶ 35). Prior to hiring the real estate agent, Plaintiff himself did not attempt to sell the Stone Gate Property. (*See* Doc. 56-4 at p. 29). Instead, Plaintiff delayed putting the Stone Gate Property on the market because he was traveling abroad and, upon returning to Louisiana, wanted to "fix up" the property before listing it for sale. (*See* Doc. 56-4 at p. 79). Ultimately, Plaintiff never received an offer on the Stone Gate Property, nor did he attempt to convert it to a rental property. (*See* DEF SOF ¶¶ 36–37).

On May 23, 2017, Plaintiff again spoke on the phone with Hodge-Njoroge and informed her that he had not received any offers on the Stone Gate Property. (*See* DEF SOF ¶ 38). At his deposition, Plaintiff conceded that "it is a possibility" that during this phone call, Hodge-Njorge told him that he would not be able to close on the purchase of the Springlake Property until he sold the Stone Gate Property:

**DEFENSE COUNSEL:** (Reading from Defendant's internal records). "Sheena Hodge-Njoroge, loan processor, resubmittal. The client still hasn't gotten any final offers on his current home. He wouldn't be able to move forward without the sale of his home. Moving closing date out 2

weeks."
Do you see that?

**PLAINTIFF:** Yes.

**DEFENSE COUNSEL:** Do you remember having a call with Sheena on or around May 23, 2017?

**PLAINTIFF:** It is a possibility.

**DEFENSE COUNSEL:** Okay. But you don't specifically remember having a call?

**PLAINTIFF:** No. I said it's a possibility.

**DEFENSE COUNSEL:** Okay. Do you remember talking to Sheena about the fact that you didn't have any offers on your current home?

**PLAINTIFF:** Yes.

**DEFENSE COUNSEL:** Okay. So do you have any reason to think that conversation wouldn't have occurred around May 23rd, 2017?

**PLAINTIFF:** I can't pinpoint the date.

**DEFENSE COUNSEL:** Okay.

**PLAINTIFF:** I did have a conversation with her.

**DEFENSE COUNSEL:** Where you discussed the status of your efforts to sell the Stone Gate Property?

**PLAINTIFF:** Yes.

**DEFENSE COUNSEL:** And what did you tell her on that call?

**PLAINTIFF:** Probably that I didn't have an offer.

**DEFENSE COUNSEL:** Okay.

**PLAINTIFF:** I just had people coming by and looking.

**DEFENSE COUNSEL:** Okay. So she says here, as part of that call did you discuss the fact that you are not going to be able to close until you

get the current home under contract?

**PLAINTIFF:** I don't know. It is a possibility she said that.

**DEFENSE COUNSEL:** Okay. Do you have a recording of this call from the 23rd?[4]

**PLAINTIFF:** Maybe. It is a possibility. Yes.

(Doc. 56-4 at p. 60).

On May 24, 2017, Font sent Plaintiff an email indicating, "I just received a call from Nic McKinney, your lender. He told me that you will not be able to close on your new home at this time until you receive a contract of sale on your current home." (*See* DEF SOF ¶ 40).

The next day, Font emailed Hodge-Njoroge inquiring about the specific documents Defendant still required from Plaintiff regarding the sale of the Stone Gate Property:

> Sheena,
>
> In our telephone conversation earlier today you stated that Mr. Reginald Williams would have to provide a purchase agreement on his current home along with a projected close date and a Good Faith Estimate from the Buyers [sic] lender to close on the home he would like to purchase. Please respond confirming these documents would suffice in order to receive the financing to close on the new home he would like to purchase.
>
> (Doc. 85-4 at pp. 2–3).

---

[4] This recording was not submitted to the Court.

Later that day, Hodge-Njoroge replied via email:

> Peggy,
>
> The closing would need to happen before or on the same day in order for the underwriter to not use the house as part of the income review.

(Doc. 85-4 at p. 1)

Font then forwarded Hodge-Njoroge's email to Plaintiff:

> Reginald,
>
> This is the email I received from Sheena earlier. So, now not only does your home have to be under contract but it must sell to purchase the other home. As you know, the process between receiving an offer on your home to closing is usually a minimum of a 30 days process unless you have a cash buyer. With this in mind, I feel that I should contact the Listing Agent of the Springlake home tomorrow morning and inform them of what is going on. Do you want me to ask him if the Seller would agree to extend the closing?"

(Doc. 85-4 at p. 1).

Plaintiff did not reply to Font's email. Instead, on May 30, 2017, Font emailed Hodge-Njoroge and requested that Defendant send Plaintiff a written declination of funding:

> Sheena and Nic,
>
> The Title Company has informed the Seller's Agent that there will be no funding for the purchase of the home that Mr. Reginald Williams is under contract to purchase tomorrow, 5/31/2017. This is a second request for a written declination of funding for this purchase. Please respond as soon as possible so that we may present this statement to the Seller.

(*See* Doc. 1-1 at pp. 16–17).

Hodge-Njoroge replied and explained that Plaintiff's Loan Application had not been declined but was delayed, stating:

> Peggy,
>
> As explained during our call together last week this loan hasn't been decline[d]. It's delayed in closing due to the loan conditions not meet [sic] yet. This loan needs additional time in order for the buyer to complete review, but only if the seller is willing to offer an extension.
>
> (*See* Doc. 85-5 at p. 1).

Font did not forward the email to Plaintiff until June 2, 2017. *See id.*

On May 31, 2017, the intended closing date of the Springlake Property, Plaintiff appeared at the title company offices with Font, Wilson, and Wilson's real estate agent, Brett Busbin. (*See* DEF SOF ¶ 43). Upon learning that the closing would not take place due to Plaintiff's failure to secure a loan from Defendant, Wilson and Busbin informed Plaintiff that they needed documentation from Defendant that Plaintiff's Loan Application was still being processed or that it had been denied. (*See* Doc. 87-10 at p. 1). Wilson and Busbin also warned Plaintiff that they would hold him to the terms and conditions of the Purchase Agreement and would not let him "get out of" it. *See id.* Later that day, Plaintiff electronically signed an Extension of Agreement to Purchase or Sell ("the Extension Agreement") that would have extended the Springlake Property closing date to June 9, 2017. (*See* DEF SOF ¶ 43–44). He then instructed Font to submit it to Busbin, but it is unclear if she ever did so. (*See* DEF SOF ¶ 45). In any case, as later events illustrate, Wilson did not execute the Extension Agreement.

On June 6, 2017, Defendant internally canceled Plaintiff's loan and resubmitted his Loan Application to its underwriters with the updated information that the Stone Gate Property had not been sold or rented. (*See* Doc. 84-8 at p. 5). Defendant's underwriters then recalculated Plaintiff's debt-to-income ratio based off the debts listed on Plaintiff's loan application, including the existing mortgage loan debt related to the Stone Gate Property. (*See* Doc. 84-1 ¶ 33). They ultimately concluded that Plaintiff's debt-to-income ratio was too high to qualify for the loan. (*See* Doc. 84-1 ¶ 32). His Loan Application was denied. *See id.*

On June 8, 2017, Busbin, via an email to Font, informed Plaintiff that Wilson had contacted an attorney about representing her in connection to the Purchase Agreement. (*See* DEF SOF ¶ 46). Busbin explained that Plaintiff was in default under the Purchase Agreement for not closing on May 31 and asked if Plaintiff would make an offer of compensation for the default prior to Wilson retaining counsel. *See id.* Apparently, Plaintiff elected to not do so. (*See* DEF SOF ¶ 47).

On June 12, 2017, Plaintiff told McKinney in a recorded phone conversation that Wilson had not received the Extension of Agreement to Purchase or Sell, had put the Springlake Property back on the market, and was suing him for defaulting on the Purchase Agreement. (*See* DEF SOF ¶ 48). McKinney responded by saying that Plaintiff's Loan Application had been conditionally approved since May 2, 2017, but that the loan had always been contingent on the sale or rental of the Stone Gate Property. (*See* Doc. 56-4 at p. 298).

On June 27, 2017, Defendant sent Plaintiff a Statement of Credit Denial, Termination, or Change informing Plaintiff that his Loan Application had been denied because he had "excessive obligations" and "insufficient income for [his] total obligations." (*See* Doc 87-11 at p. 1). The statement explained that "[Defendant's] credit decision was based in whole or part on information obtained in a report from the consumer-reporting agency...." *See id.* It also listed several key factors from the consumer-reporting agency that adversely affected Plaintiff's credit score: "(1) ratio of balance to limit on bank revolving or other revolving accounts too high" (2) too many accounts with balances; (3) too many inquiries last 12 months; and (4) too many accounts recently opened." (*See* Doc 87-11 at p. 2). According to Craig Cross, Defendant's Vice President of Customer Experience, Plaintiff's failure to sell the Stone Gate Property and pay-off the mortgage loan on that property made Plaintiff's debt-to-income ratio too high to qualify for the loan. (*See* DEF SOF ¶ 51).

On July 11, 2017, Wilson sued Plaintiff for breach of the Purchase Agreement in the 21st Judicial District Court for the State of Louisiana. (*See* DEF SOF ¶ 52). On October 2, 2018, Wilson filed a motion for summary judgment, and Plaintiff failed to respond. (*See* DEF SOF ¶ 55). The state court granted Wilson's summary judgment motion and ordered Plaintiff to pay $24,500 and 25% in attorney fees. (*See* Doc. 1-1 at p. 35). Plaintiff failed to pay the judgment, and subsequently filed several Chapter 13 bankruptcy petitions. (*See* DEF SOF ¶¶ 57–62).

### B. Procedural History

Plaintiff initiated this action on October 1, 2019, alleging that Defendant

violated the ECOA and its supporting regulations by failing to timely notify him of its action, adverse or not, on his Loan Application, failing to timely provide him with a written Statement of Reasons for such action, and failing to provide him with a clear and conspicuous disclosure. (*See* Doc. 32-4 at pp. 5–6; Doc. 87-1 at p. 7). Plaintiff also alleges several damages caused by Defendant's purported violations, including the $24,500 judgment entered against him in the breach of contract lawsuit. *See id.*

In the instant Motion, Defendant argues that the undisputed facts demonstrate that it did not violate the ECOA when considering and ultimately rejecting Plaintiff's Loan Application and denies Plaintiff's claims for damages. (*See* Doc. 82-1 at p. 1). Plaintiff opposes Defendant's Motion in its entirety. (Doc. 87).

## II.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides that, "[t]he court shall grant summary judgment if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When determining whether the movant is entitled to judgment as a matter of law, the Court views facts in the light most favorable to the non-movant and draws all reasonable inferences in their favor. *See Coleman v. Houston Indep. Sch. Dist.*, 113 F.3d 528, 533 (5th Cir. 1997). After a party moves for summary judgment, the non-movant must set forth specific facts showing there is genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "At this stage, the Court does not evaluate the credibility of witnesses, weigh the evidence, or resolve factual disputes." *Minnis v. Bd. Of Sup'rs of Louisiana State Univ. & Agric. & Mech. Coll.*,

55 F. Supp. 3d 864, 873 (M.D. La. 2014). Rather, the Court simply asks whether the evidence in the record is sufficient for a reasonable jury, "drawing all inferences in favor of the non-moving party, could arrive at a verdict in that party's favor." *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991). If the answer is yes, the motion for summary judgment must be denied. *See id.*

On the other hand, the non-movant cannot satisfy their evidentiary burden by some metaphysical doubt as to the material facts, conclusory allegations, unsubstantiated assertions, or a mere scintilla of evidence. *See Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). If the non-movant "fails to make a showing sufficient to establish the existence of an element essential to that party's case," summary judgment is appropriate. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

## III.    LAW AND ANALYSIS

The purpose of the ECOA is to eradicate credit discrimination. *Phoenix v. Wells Fargo Bank, N.A.*, No. 16-cv-75, 2016 WL 7379001, at *3 (M.D. La. Dec. 20, 2016) (Brady, J.) (citing *Anderson v. United Finance Co.*, 666 F.2d 1274, 1277 (9th Cir. 1982). To this end, the ECOA requires (among other things) "that a creditor must notify an applicant for credit of 'adverse action' taken against his application and, in so doing, must give a written statement of the specific reasons therefor." *Jochum v. Pico Credit Corp. of Westbank*, 730 F.2d 1041, 1042 (5th Cir. 1984) (citations omitted). The ECOA defines adverse action as "a denial or revocation of credit, a change in the terms of an existing credit arrangement, or a refusal to grant credit in substantially the amount or on substantially the terms requested." 15 U.S.C. § 1691(d)(6). "Any

creditor who fails to comply with ECOA's requirements shall be liable to an 'aggrieved applicant' for actual or punitive damages, and an 'aggrieved applicant' may obtain "such equitable and declaratory relief as is necessary to enforce" EOCA's requirements." *Chen v. Chase Bank USA, N.A.*, 393 F. Supp. 3d 850, 852 (N.D. Cal. 2019) (citing 15 U.S.C. § 1691e(a)-(c)).

### A. Plaintiff's Loan Application Was Not Complete Upon Submission

Plaintiff's central claim is that Defendant failed to properly notify him of its adverse action on his Loan Application within 30 days of receiving it, thus violating its obligations under the ECOA. (*See* Doc. 87-1 at p. 7). Because the ECOA sets forth different notification requirements of lenders for "complete" versus "incomplete" applications, the Court must first determine whether Plaintiff's Loan Application was complete when he submitted it to Defendant in April 2017.[5]

Under the ECOA, "[a] completed application means an application in connection with which a creditor has received all the information that the creditor regularly obtains and considers in evaluating applications for the amount and type of credit requested...including...any additional information requested from the applicant." 12 C.F.R. § 1002.2(f). "[A]n application is considered 'complete' not when the applicant completes it...but when the creditor has obtained verifying information and whatever other types of reports or information it ordinarily requires to evaluate a loan." *High v. McLean Financial Corp.*, 659 F. Supp. 1561, 1564 (D.D.C. 1987); *see*

---

[5] Notably, the Parties each assume for present purposes that Plaintiff's Loan Application was "complete" upon submission. (*See* Doc. 82-1 at p. 13; Doc. 87-1 at p. 2). For reasons set forth below, the Court cannot credit this assumption.

*also Kirk v. Kelley Buick of Atlanta, Inc.*, 336 F. Supp. 2d 1327, 1332 (N.D. Ga. 2004).

For example, in *Kirk v. Kelley Buick of Atlanta*, the plaintiff attempted to purchase a car, and, via the dealership, applied to a creditor for financing. *See Kirk*, 336 F. Supp. 2d at 1328. After receiving the plaintiff's credit application, the creditor issued to the dealership a notice of approval, subject to the verification of information contained in the credit application. *See id.* The dealership then orally notified the plaintiff about the additional documentation required to finalize the loan. *See id.* at 1328–29. The plaintiff never submitted all of the requested verification documents, and the creditor ultimately denied the loan. *See id.* at 1329. The *Kirk* Court found that because the creditor required additional information from the plaintiff before granting credit to the applicant, the application was incomplete. *See id.* at 1332.

Here, the operative facts are nearly identical to those at issue in *Kirk*. Defendant conditionally approved Plaintiff's Loan Application, but orally informed Plaintiff that final approval of the loan was conditioned upon verification that the Stone Gate Property was sold and that the Stone Gate Property mortgage was paid off. (*See* DEF SOF ¶ 34). Because Plaintiff failed to sell the property, he was ultimately unable to satisfy a condition required for approval of the loan. Once the Springlake Property closing date had passed, and Plaintiff was still unable to sell the Stone Gate Property, Defendant denied Plaintiff's Loan Application.

Thus, as in *Kirk*, the Court finds that Plaintiff's Loan Application remained incomplete because Plaintiff failed to submit the additional documents required in the Conditional Loan Approval. *See Kirk*, 336 F. Supp. 2d at 1328; *see also High*, 659

F. Supp. at 1564; *Dufay v. Bank of Am. N.T. & S.A. of Oregon*, 94 F.3d 561 (9th Cir. 1996). Accordingly, the Court must analyze Plaintiff's ECOA claim under the standards applicable to incomplete applications.

## B. Defendant satisfied the ECOA's Notice Requirements for Incomplete Applications

Having determined that Plaintiff's Loan Application was incomplete upon submission, Plaintiff's notification claim hinges on whether Defendant violated the ECOA's notice requirements for incomplete applications. In relevant part, the ECOA's implementing regulations set forth *two* notice requirements for "incomplete applications." First, the creditor must notify the applicant within 30 days of any "adverse action" on an incomplete application. *See* 12 C.F.R. § 202.9(a)(1)(ii) & (c)(1)(i). Second, as an alternative, the creditor may notify the applicant within 30 days "[o]f the incompleteness" and request additional information:

> (2) Notice of incompleteness. If additional information is needed from an applicant, the creditor shall send a written notice to the applicant specifying the information needed, designating a reasonable period of time for the applicant to provide the information, and informing the applicant that failure to provide the information requested will result in no further consideration being given to the application. The creditor shall have no further obligation under this section if the applicant fails to respond within the designated time period. If the applicant supplies the requested information within the designated time period, the creditor shall take action on the application and notify the applicant in accordance with paragraph (a) of this section.

> (3) Oral request for information. At its option, a creditor may inform the applicant orally of the need for additional information. If the application remains incomplete the creditor shall send a notice in accordance with paragraph (c)(1) of this section.

(12 C.F.R. § 202.9(c)(2)-(3)).

Here, Defendant complied with the first notice requirement—at *least* insofar

as Defendant notified Plaintiff on June 27, 2017 of its June 6 decision to deny Plaintiff's Loan Application.

The remaining question is whether Defendant complied with the "notice of incompleteness" requirements *prior to* its June 6 rejection of Plaintiff's Loan Application. Plaintiff argues that Defendant was required under 12 C.F.R. § 202.9(c) to send a written notice of incompleteness. (*See* Doc. 87-1 at p. 7). This argument fails because paragraph (c)(3) clearly provides that "[a]t its option, a creditor may inform the applicant *orally* of the need for additional information. If the application remains incomplete, the creditor shall send a notice in accordance with paragraph (c)(1)." 12 C.F.R. § 202.9(c)(3) (emphasis added). *See also Piotrowski v. Wells Fargo Bank*, NA, No. CIV.A. DKC 11-3758, 2015 WL 4602591 *7 (D. Md. July 29, 2015) (*citing Kirk*, 336 F. Supp. 2d at 1327).

Here, the evidence demonstrates that Defendant orally notified Plaintiff on May 15, 2017 of the need for additional information to complete his Loan Application. According to Defendant's records, Hodge-Njoroge called Plaintiff and "went over the outstanding items" for his Loan Application. (*See* Doc. 84-8 at p. 6). Plaintiff does not deny that this phone call occurred. Rather, at his deposition, Plaintiff claimed he "did not remember" the phone call. (*See* Doc. 56-4 at p. 60). When asked specifically whether the phone call happened at all, Plaintiff reiterated, "I just don't remember." (*See* Doc. 56-4 at p. 60).

As the U.S. Court of Appeals for the Fifth Circuit has cautioned, "[l]ack of memory by itself is insufficient to create a genuine dispute of act." *Hemphill v. State*

*Farm Mut. Auto. Ins. Co.*, 805 F.3d 535 (5th Cir. 2015) (*citing Dickey v. Baptist Mem'l Hosp.-N. Mississippi*, 146 F.3d 262, 266 n.1 (5th Cir. 1998) ("The mere fact that [the witness] does not remember the alleged phone conversation, however, is not enough, by itself, to create a genuine issue of material fact.")). Thus, Plaintiff's testimony that he does not remember the May 15th oral notification does not create a genuine dispute as to whether notice occurred.

Indeed, the record evidence reveals the complete lack of a genuine dispute. Two days after the May 15th phone call, Plaintiff finally hired a realtor to list the Stone Gate Property on the housing market. (*See* DEF SOF ¶ 35). This substantiates Defendant's version of events—that is, the May 15 call occurred, *and* that on this call Hodge-Njoroge warned Plaintiff that his current house must be sold (or rented) before his new loan was approved. The record also reflects that Defendant followed up with Plaintiff about the Stone Gate Property sale on May 23rd and with Font on May 24th. On June 6th, when the Loan Application remained incomplete, due to Plaintiff's failure to sell the Stone Gate Property, Defendant canceled the loan. (*See* Doc. 84-8 at p. 5). Thereafter, Defendant then timely and properly notified Plaintiff of its adverse action on his incomplete Loan Application in accordance with 12 C.F.R. § 202.9(c)(1), thus fulfilling its obligations under the ECOA. For these reasons, Plaintiff's ECOA claim must be dismissed.

## IV.    CONCLUSION

Accordingly,

**IT IS ORDERED** that the Defendant's **Motion for Summary Judgment**

(Doc. 82) is **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiffs' action be and is hereby **DISMISSED WITH PREJUDICE**.

Judgment will issue separately.

Baton Rouge, Louisiana, this _25th_ day of January, 2023

_____

**JUDGE BRIAN A. JACKSON**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**